**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 6:21-CV-00295-RAW** |
| | ) | |
| **DOLGENCORP, LLC d/b/a** | ) | |
| **DOLLAR GENERAL,** | ) | |
| | ) | |
| **Defendant** | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................................ 3

    A.    Dollar General Has Policies Prohibiting Discrimination, Harassment, and Retaliation, and Provides Clear Procedures on How to Report Such Allegations.. 3

    B.    Dollar General Hired DeAngelis to Take Over Underperforming Region and District Managers Immediately Expressed Concerns over DeAngelis' Age. ......... 4

    C.    Investigation into DeAngelis After Chip Boyles Resigns Alleging Age Discrimination. .................................................................................................... 5

    D.    Dollar General Hosts New Leader Assimilation for DeAngelis. ........................... 7

    E.    Greg Phillips is Terminated for Falsifying Documents. ...................................... 7

    F.    Lorenzo is Terminated for Falsifying Documents. ................................................ 8

    G.    DeAngelis' Actions Show His Support of Older DMs. .......................................... 9

    H.    Sims Resigns Alleging DeAngelis Discriminated Against Him; DeAngelis Terminated. ......................................................................................................... 9

    I.    Sims Files EEOC Charge With the EEOC; EEOC Files Present Lawsuit ........... 10

III.    ARGUMENT AND AUTHORITIES ........................................................................ 10

    A.    Dollar General is Entitled to Summary Judgment on EEOC's Harassment Claims. .................................................................................................................. 10

        1.    Claims Regarding Lorenzo's Allegations of Harassment Are Not Actionable. .............................................................................................. 11

        2.    Claims Regarding Phillips' Allegations of Harassment Are Not Actionable. .............................................................................................. 12

        3.    Claims Regarding Sims' Allegations of Harassment Are Not Actionable. .............................................................................................. 13

    B.    Summary Judgment Is Appropriate on the EEOC's Claim for Sims' Constructive Discharge. ............................................................................................................ 14

    C.    Dollar General Is Entitled to Summary Judgement Under *Faragher*/*Ellerth* Due to Sims' Failure to Report the Alleged Harassing Conduct ....................................... 17

    D.    Summary Judgment is Appropriate on EEOC's Discharge-Based-on-Age Claims. .................................................................................................................. 19

        1.    EEOC's Discharge Based on Age Claims Fail Related to Lorenzo and Phillips. ................................................................................................... 20

        2.    EEOC's Claim Related to Phillips Also Fails due to After-Acquired Evidence. ................................................................................................. 21

    E.    EEOC's Claims for Retaliation Against Lorenzo and Phillips Also Fail. ........... 21

        1.    The EEOC's Claim for Retaliation Related to Lorenzo Fails. ................... 22

**TABLE OF CONTENTS**
**(continued)**

Page

2.    The EEOC's Claim for Retaliation Related to Phillips' Claim Fails. ...... 23

3.    Phillips and Lorenzo's Punitive and Emotional Distress Damages Claims
      are Prohibited as a Matter of Law............................................................. 24

IV.    CONCLUSION.................................................................................................. 25

CERTIFICATE OF SERVICE ....................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Ballard v. Muskogee Reg'l Med. Ctr.*,
   238 F.3d 1250 (10th Cir. 2001) ....................................................................................21

*Bennett v. Windstream Communications, Inc.*,
   30 F. Supp. 3d 1243 (N.D. Okla. 2014), aff'd, 792 F.3d 1261 (10th Cir. 2015) ....................15

*Brunner v. GN Bank, N.A.*,
   2023 WL 2474683 (D. Kan. March 13, 2023).........................................................................24

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998)..................................................................................................................17

*Calloway v. Aerojet General Corp.*,
   419 Fed. App'x 840 (10th Cir 2011) ......................................................................................19

*Cejka v. Vectrus Sys. Corp.*,
   823 Fed. App'x 591 (10th Cir. 2020) .....................................................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................................................10

*Cink v. Grant Cnty., Oklahoma*,
   No. CIV-13-1069-C, 2016 WL 1717230 (W.D. Okla. Apr. 28, 2016)...................................11

*Conroy v. Vilsack*,
   707 F.3d 1163 (10th Cir. 2013) ..............................................................................................22

*Davis v. U.S. Postal Serv.*,
   142 F.3d 1334 (10th Cir. 1998) ..............................................................................................11

*DeWalt v. Meredith Corp.*,
   288 F. App'x 484 (10th Cir. 2008) .........................................................................................11

*Faragher v. Boca Raton*,
   524 U.S. 775 (1998).................................................................................................................17

*Harris v. Forklift Systems, Inc.*,
   510 U.S. 17 (1993)...................................................................................................................11

*Helm v. Kansas*,
   656 F.3d 1277 (10th Cir. 2011) ..............................................................................................17

*Hernandez v. Valley View Hosp. Ass'n*,
    684 F.3d 950 (10th Cir. 2012) ...................................................................................11, 13

*Hernoe v. Lone Star Indus., Inc*.,
    No. 12-CV-0167-CVE-TLW, 2012 WL 4052536 (N.D. Okla. Sept. 13, 2012).....................11

*Hinds v. Sprint/United Mgmt. Co.*,
    523 F.3d 1187 (10th Cir. 2008) ...................................................................................22

*Howell v. New Mexico Dep't of Aging & Long Term Services*,
    398 F. App'x 355 (10th Cir. 2010) ...............................................................................11

*Jones v. Oklahoma City Pub. Sch.*,
    617 F.3d 1273 (10th Cir. 2010) ...................................................................................20

*Marshall v. BNSF Railway Co.*,
    No. 18-cv-2385, 2020 WL 128054 (D. Kan. Jan. 10, 2020) ...................................................24

*McDonnell Douglas v. Green*,
    411 U.S. 792 (1973)......................................................................................19, 20, 21

*McKennon v. Nashville Banner Pub. Co.*,
    513 U.S. 352 ...................................................................................................21

*Meiners v. Univ. of Kansas*,
    359 F.3d 1222 (10th Cir. 2004) ...................................................................................22

*Morris v. City of Colorado Springs*,
    666 F.3d 654 (10th Cir. 2012) ...................................................................................11, 13

*Moskowitz v. Trs. of Purdue Univ.*,
    5 F.3d 279 (7th Cir. 1993) .........................................................................................24

*Pennsylvania State Police v. Suders*,
    542 U.S. 129 (2004)..............................................................................................15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)..............................................................................................20

*Riggs v. AirTran Airways, Inc.*,
    497 F.3d 1108 (10th Cir. 2007) ...................................................................................21

*Rivero v. Bd. of Regents of Univ. of New Mexico*,
    950 F.3d 754 (10th Cir. 2020) ...................................................................................16

*Sanchez v. Denver Public Schs.*,
    164 F.3d 527 (10th Cir. 1998) ...................................................................................15

*Sandoval v. City of Boulder,*
  Colo., 388 F.3d 1312 (10th Cir. 2004) ................................................................15

*Scott v. Harris,*
  550 U.S. 372 (2007) ...........................................................................................10

*Stapp v. Curry Cty. Bd. of Cty. Commissioners,*
  672 F. App'x 841 (10th Cir. 2016) ................................................................17, 21

*Timmerman v. U.S. Bank, N.A.,*
  483 F.3d 1106 (10th Cir. 2007) ..........................................................................22

*Vaughan v. Anderson Reg'l Med. Ctr.,*
  849 F.3d 588 (5th Cir. 2017) ...............................................................................24

*Villescas v. Abraham,*
  311 F.3d 1253 (10th Cir. 2002) ...........................................................................24

*Wilbanks v. Nordam Group, Inc.,*
  No. 09-CV-0572-CVE-TLW, 2010 WL 4272581 (N.D. Okla. Oct. 25, 2010) ......11

## Federal Statutes

ADA ..............................................................................................................................24

ADEA ................................................................................................................1, 11, 24

## Rules

Fed. R. Civ. P. 56(a) ...............................................................................................1, 10

Defendant Dolgencorp, LLC ("Dollar General") asks the Court to render summary judgment against Plaintiff Equal Employment Opportunity Commission ("the EEOC"), as authorized by Federal Rule of Civil Procedure 56.

## I.       INTRODUCTION

The EEOC brought this Age Discrimination in Employment Act ("ADEA") action against Dollar General on behalf of three former District Managers ("DMs") from its Region 73. The three DMs at issue are Bill Sims, Gregory Phillips, and Gloria Lorenzo ("Claimants"). The EEOC alleges that Claimants were subjected to a hostile work environment by Nic DeAngelis, their younger Regional Director (RD), and were ultimately terminated (Lorenzo and Phillips) or forced to quit (Sims) due to their age during DeAngelis' tenure.

The evidence tells a different story. Although DeAngelis aggressively coached his DMs (of all ages) and pushed them to improve the performance of their districts, he did so based on their performance and not their age. Claimants admitted that DeAngelis coached them and their younger peers based on legitimate performance issues. Ironically, the only evidence of individuals discussing anyone else's age were some of DeAngelis' DMs (including Phillips and Lorenzo) who took issue with how young DeAngelis was. For the reasons outlined herein, the EEOC's claims cannot survive summary judgment.

First, the EEOC's claim for harassment fails because it cannot establish that Lorenzo, Phillips, or Sims were subjected to a hostile work environment. Lorenzo only alleged a handful of benign comments either having nothing to do with age, or that were not directed at her. Phillips alleged only one specific comment in which DeAngelis mentioned age. The statements alleged by Sims are contradicted by other testimony and, even if true, cannot show a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Second, the EEOC's constructive discharge claim on behalf of Sims fails because the EEOC cannot establish that Dollar General made Sims' working environment "so difficult or intolerable that he [had] no other choice but to resign." The alleged statements made by DeAngelis do not support such a finding. Moreover, during the same time period that Sims now alleges he was being discriminated against because of his age, he was twice asked to give honest feedback regarding DeAngelis and did not voice any complaints. Sims also admits that all feedback provided by DeAngelis related to Sims' job performance. During the time that Sims alleges he was forced

to resign, DeAngelis provided him a positive performance review, a raise, and over $7,200 in bonuses (including a large bonus he waited to receive on December 15, 2017, before he resigned that day). The facts simply do not support a constructive discharge claim.

Third, Dollar General is entitled to summary judgment on Sims' claims under the *Faragher/Ellerth* defense. Dollar General exercised reasonable care to prevent and promptly correct harassing behavior and Sims unreasonably failed to take advantage of any preventative or corrective opportunities. Indeed, Dollar General's Human Resources department came to Sims on two separate occasions to discuss any alleged complaints against DeAngelis. Sims failed to make a complaint at either opportunity. Sims was a well-seasoned DM, and part of his job was to work with the Human Resources partner assigned to his district to resolve employee complaints and concerns. Thus, there could be no confusion as to how Sims should have lodged any complaint he had through the proper channels. Instead, however, Sims disregarded his training and sent a random email to someone he did not know and who had no responsibility for addressing employee complaints. That person never saw Sims' email, and Sims never followed up with her (or anyone else) regarding his alleged issues with DeAngelis. Because Sims chose to disregard the well-defined reporting mechanisms, Sims claims are barred.

Fourth, the EEOC's claim for discharge based on age related to Lorenzo's and Phillips' terminations lack merit. Lorenzo was terminated for falsifying documents related to loss prevention. Lorenzo's actions were discovered and investigated by an employee in Dollar General's loss prevention department (*i.e.*, not DeAngelis). The investigation established that Lorenzo falsified the documents (demonstrating that she was not properly investigating instances of shrink in her district) and she was terminated accordingly. Phillips was terminated for falsifying documents related to a store visit. Phillips admitted to the falsification and explicitly acknowledged that what he had done was wrong, and that he would understand if he were to be terminated for his actions. As Phillips accurately predicted, he was terminated for falsifying company documents. Both Phillips' and Lorenzo's terminations had nothing to do with their ages.

Fifth, the EEOC's retaliation claims related to Lorenzo and Phillips also lack merit for the same reason as its claim for discharge based on age—Lorenzo and Phillips were both terminated for legitimate, non-retaliatory reasons unrelated to their age. Moreover, although Phillips and Lorenzo had complained to Human Resources as to DeAngelis's management style, the evidence establishes that DeAngelis was never aware of these complaints and thus could not have

"retaliated" against them because of it. Additionally, Lorenzo's and Phillips' claim for punitive damages related to the retaliation claim are prohibited as a matter of law.

Therefore, Dollar General is entitled to summary judgment on each of the EEOC's claims.

## II.     STATEMENT OF FACTS

**A.     Dollar General Has Policies Prohibiting Discrimination, Harassment, and Retaliation, and Provides Clear Procedures on How to Report Such Allegations.**

1.     Dollar General is an equal opportunity employer and maintains company-wide policies prohibiting harassment, discrimination, and retaliation. Sims Dep.[1] at 63:12-67:15, 68:7-70:2, 70:6-73:2, 73:3-74:8, Ex. 5, Ex. 6, Ex. 7, Ex. 8. Dollar General takes a zero-tolerance approach to violations of its Anti-Discrimination and Harassment Policy. Sims Dep. at 74:14-24; Lorenzo Dep.[2] at 37:23-39:3, Ex. 2; Phillips Dep.[3] at 32:12-34:8, Ex. 4; Casey Dep.[4] at 10:9-12, 14:18-16:5, Ex. 3. Each Claimant acknowledged receipt of Dollar General's Anti-Discrimination and Harassment Policy when they began their employment, and annually upon their review of Dollar General's handbook. Phillips Dep. at 32:10-33:5; Sims Dep. at 71:21-74:16, Ex. 7, Ex. 8; Lorenzo Dep. 37:23-38:9, Ex. 2. As District Managers ("DMs"), Claimants were not only well aware of the Anti-Discrimination and Harassment Policy, they were also responsible for ensuring it was implemented within their districts, and ensuring that employees in their districts were not subjected to discrimination or harassment. Phillips Dep. at 39:15-18; Sims Dep. at 65:3-7; Lorenzo Dep. at 64:4-20. Moreover, if discrimination and harassment were alleged in their districts, the DMs would be required to partner with Dollar General's Human Resources department to investigate these allegations and ensure that Dollar General's Anti-Discrimination and Harassment Policy was properly implemented. Sims Dep. at 140:4-23, 142:7-23; *see also* Sherrod Dep.[5] at 40:3-11.

2.     As part of its Anti-Discrimination and Harassment Policy, Dollar General provides multiple mechanisms for employees to make complaints of perceived unfair treatment, including harassment, discrimination, and retaliation. Employees who believe that they have been the subject of any form of harassment or discrimination by anyone at Dollar General, or who have witnessed

---

[1] Relevant excerpts of the Deposition of William Sims ("Sims Dep.") are attached hereto as **Exhibit A**.
[2] Relevant excerpts of the Deposition of Gloria Lorenzo ("Lorenzo Dep.") are attached hereto as **Exhibit B.**
[3] Relevant excerpts of the Deposition of Gregory Phillips ("Phillips Dep.") are attached hereto as **Exhibit C.**
[4] Relevant excerpts of the Deposition of Pamela Casey ("Casey Dep.") are attached hereto as **Exhibit D.**
[5] Relevant excerpts of the deposition of Leslie Sherrod ("Sherrod Dep.") are attached as Exhibit E.

harassment, discrimination, or retaliation, "should immediately report the matter to the Employee Response Center (ERC)." Sims Dep. at 72:25-75-9, Ex. 8. The ERC can be accessed via a toll-free telephone number that is provided to employees in a variety of ways, including in the employee handbook (Sims Dep. at Ex. 5, Ex. 8), the Standard Operating Procedures (Sims Dep. at Ex. 11), the Open Door Policy (Sims Dep. at 66:15-19, Ex. 8, Ex. 11), and posters displayed in every Dollar General store (Johnson Dep.[6] at 78:8-11). Moreover, employees are reminded annually with the distribution of its handbook that Dollar General is an equal opportunity employer, without regards to age (or other protected categories), and that employees should contact their manager or human resources with any questions related to Dollar General's policies. *See, i.e.,* Sims Dep. at Ex. 7.

3.       Additionally, Dollar General implements an Open Door Policy to address work-related questions, problems, or concerns. Sims Dep at 66:15-19, 75:10-18, 80:19-22, Ex. 8, Ex. 11. The Open Door Policy provides that if an employee would like to bring a concern to Dollar General's attention, the employee should: (1) discuss the concern with the employee's immediate supervisor, if the employee is comfortable doing so; (2) if the supervisor is part of the concern, discuss the concern with the next level of management; and (3) if the employee is not satisfied with the responses from the employee's managers, contact Human Resources. Sims Dep. Ex 5 at p.1, Ex. 8 at pp.4-5, Ex. 10 at p.4, Ex. 11 at p.4.

4.       Claimants, including Sims, knew and understood how to lodge a complaint of discrimination, harassment, or retaliation to Dollar General. Sims Dep. at 63:24-67:15, 79:9-80-4, 80:7-81:14, Ex. 5, Ex. 7, Ex. 8, Ex. 10, Ex. 11.

## B.    Dollar General Hired DeAngelis to Take Over Underperforming Region and District Managers Immediately Expressed Concerns over DeAngelis' Age.

5.       As DMs, Claimants were responsible, in part, for ensuring stores within their districts are managed and operated according to Dollar General's standards, including but not limited to, profit and loss, recruiting, administering company policies and practices (including the Anti-Discrimination and Harassment Policy), sales growth, effective planning, and execution of company objectives. Phillips Dep. at 39:15-18, 178:16-22; Sims Dep. at 65:3-7, 91:9-92:11, Ex. 5, Ex. 12; Lorenzo Dep. at 64:4-20.

6.       Region 73 (where Claimants were DMs) was a notoriously poor performing region partly because the former RD did not hold the DMs accountable. Casey Dep. 29:8-32:20, 108:4-

---

[6] Relevant excerpts of the Deposition of Dana Johnson ("Johnson Dep.") are attached hereto as Exhibit J.

109:6. In fact, Region 73 was widely considered to be one of the five worst Regions from an operational standpoint in the entire company. DeAngelis Dep.[7] at 72:25-75:13; Sims Dep. at 111:2-10; *see also* Casey Dep. at 47:10-48:10 (their Region was "bottom of the barrel").

7.      Dollar General hired DeAngelis as RD of Region 73 in July 2016. DeAngelis Dep. at 79:16-18. From the beginning of his tenure, DMs voiced their disapproval of DeAngelis's (younger) age. Sims Dep. at 175:10-176:3 (stating that Boyles, Lorenzo, and Phillips all had problems getting past DeAngelis's young age); *see also* Casey Dep. at 61:1-22 (stating that at a new leader assimilation regarding DeAngelis's leadership, no DM alleged that he was discriminating against them on the basis of age and that the only discussion of age surrounded DeAngelis being young); Shillingford Dep.[8] at 35:12-36:1 (stating that *DeAngelis's* age (but no one else's) came up during a new leader assimilation with his DMs).

8.      Unlike his predecessor, DeAngelis aggressively coached his DMs (of *all* ages), pushing them to improve the performance of their districts. DeAngelis Dep. at 153:20-21, 155:11-15. DeAngelis conducted more frequent store visits (going to stores unannounced) and provided feedback and instruction to the DMs. DeAngelis Dep. at 93:9-94:1; Sims Dep. at 219:13-220:13. DeAngelis expected more from the DMs than they were used to (Casey Dep. 29:8-32:20), and some did not like him because of it (*id*. at 36:7-13, 40:22-41:4, 42:18-44:8).

**C.      Investigation into DeAngelis After Chip Boyles Resigns Alleging Age Discrimination.**

9.      On September 3, 2016, shortly after DeAngelis began working at Dollar General, DM Chip Boyles resigned from his DM position. Reardon Dep.[9] Ex. 2. In his resignation letter, Boyles alleged that DeAngelis openly referred to himself as a "millennial" and said that Dollar General "wants and needs [DeAngelis's] type of energy," in addition to "constantly yell[ing]" and accusing Boyles of making excuses. Price Dep.[10] Ex. 6.

10.     Dollar General investigated by reaching out to the other DMs in Region 73 re their experiences with DeAngelis. Six DMs gave positive statements regarding their experience with DeAngelis. Price Dep. at 248:5-24.

11.     Sims, himself, stated that DeAngelis' hiring was "needed" and was "an eye opener" for Sims because he "really didn't want to admit to just how broken" Region 73 was. Sims Dep.

---

[7] Relevant excerpts of the depositions of Nic DeAngelis ("DeAngelis Dep.") are attached hereto as Exhibit F.
[8] Relevant excerpts of the deposition of Nichelle Shillingford ("Shillingford Dep.") are attached as Exhibit G.
[9] Relevant excerpts of the Deposition of Kathy Reardon ("Reardon Dep.") are attached hereto as Exhibit H.
[10] Relevant excerpts of the Deposition of Sarah Price ("Price Dep.") are attached hereto as Exhibit I.

Ex. 21. Sims stated that DeAngelis had Region 73 "moving in the right direction" and that Sims had "called on [DeAngelis] several times for support, questions and direction" and DeAngelis had "not let me down on any occasion!" *Id.* Sims also said that DeAngelis had "an intense desire to get [Region 73] back on track," which forced Sims to take "some hard looks" at what he and his team was doing, which Sims said he needed. *See id.* Sims then stated that he felt "like everyone needs to get past [DeAngelis's] age, where he is from and what he has done in the past with other companies" and that once the other DMs got to know DeAngelis they would "find a very intelligent, focused and intense leader." *Id.* Sims' statement finished by stating that "[t]hese are my honest opinions and I hope they help you in some way." *Id.*

12.     The other positive statements were from Zach Burns (age 34), Deana Fisher (age 44), Pam Casey (age 58), Greg Hunter (age 43), and Mark Turvey (age 60). Price Dep. at 248:25-249:15, Ex. 9 at SIMS_00000026 (Casey stating "I appreciate our new leader's honesty, grit and willingness to get into the trenches to help us solve issues more quickly than I have ever seen before. It is refreshing to see that kind of passion. I believe the Region will move quickly to favorable metrics under our new leader's direction."), SIMS_0000023 (Fisher stating "I'm happy and fine. Took me a minute to understand his urgency but I get it, were [sic] failing as a team. My managers love him and we get it. We are good and appreciate his support"), SIMS_0000027 (Hunter stating "I really enjoy Nic's enthusiasm and focus on details of the business … For me things are good … I feel I have a really good working rapport with Nic, and feel that he is bringing much needed insight and focus into the Region … I have heard other DMs in the Region say very positive things about their interactions with Nic on conference calls and that they have appreciated his leadership in the short time he has been in the RD role").

13.     Phillips and Lorenzo were the only DMs who provided any negative feedback regarding DeAngelis. Price Dep. at 240:19-241:13.

14.     As part of the investigation, it was also revealed that DeAngelis was actively coaching Boyles regarding Boyles' job performance, including stores within Boyles' district that were putting customer safety in jeopardy. Price Dep. at 250:25-252:16; DeAngelis Dep. at 134:22-137:4 (stating that during a store visit within Boyles' district, DeAngelis found product that was being stored out-of-code and was being offered for sale despite being out-of-date).

15.     After its investigation, Dollar General determined that Boyles' allegations of age discrimination and a hostile work environment were not substantiated. Price Dep. Ex. 18.

Nonetheless, DeAngelis' Divisional Vice President, Jeff Mooney, and Human Resources Director, Dana Johnson, provided coaching to DeAngelis on language and tact. Johnson Dep. at 168:5-169:8, 174:25-175:25, 209:11-14, Ex. 14. This coaching session included detailed instructions about future interactions with his DMs and ceasing the use of any age-related language. Johnson Dep. at Ex. 14; Mooney Dep.[11] at 66:7-67:20, Ex. 3.

**D.    Dollar General Hosts New Leader Assimilation for DeAngelis.**

16.    New Leader Assimilations are typical for newly hired Dollar General DMs, RDs, Division Vice Presidents, or executives, and typically occur within 90 to 120 days of hiring. Shillingford Dep. at 19:25-21-7. The New Leader Assimilation is intended to be an opportunity for employees who directly report to the leader to get to know their new leader and provide feedback related to the new leader's management style and integration. *Id.*

17.    Within weeks of Dollar General coaching DeAngelis, it hosted a mandatory New Leader Assimilation for DeAngelis and his DMs to collaborate on his performance, and DMs were asked to voice their opinions about DeAngelis outside of his presence and to HR. Shillingford Dep. at 19:25-20:12, 78:5-16; Casey Dep. at 59:2-63:24.

18.    Sims participated in DeAngelis' New Leader Assimilation and, consistent with his glowing written evaluation of DeAngelis (*see* ¶ 11), he reported nothing negative, such as the harassment he *now claims* existed then. Sims Dep. at 194:9-21; 195:16-196:14. In fact, *none* of the DMs in Region 73 reported age-related complaints, and instead complained about only petty issues. Casey Dep. 59:2-61:12; *see also* Shillingford Dep. at 35:5-36:1 (stating that she did not recall any age-related complaints being shared outside of concerns regarding DeAngelis's age).

**E.    Greg Phillips is Terminated for Falsifying Documents.**

19.    On October 7, 2016, Phillips signed and submitted a verification form for holiday season Quality Service Visit ("QSV") attesting that he had conducted in-person verifications that inventory and displays were prepared for the holiday season at stores in his district.[12] Phillips Dep. at 166:5-167:2, Ex. 13. However, when DeAngelis performed a random store visit on October 7, 2016 in Phillips' district, he found that the displays had not been set up and inventory had not been

---

[11] Relevant excerpts of the Deposition of Jeff Mooney ("Mooney Dep.") are attached hereto as Exhibit K.
[12] QSVs describe DG's metric for conducting store visits focusing on developing store teams to deliver customer ready stores every day and deliver financial results. During QSVs, DMs evaluate the store's overall appearance and organization, back office, receiving room, other non-selling areas of the stores, and then establishes an action plan for any deficient areas of the store. Mooney Dep. at 72:22-74:2.

verified as Phillips attested. DeAngelis Dep. at 320:4-322:25, Ex. 22, Ex. 23.

20.     DeAngelis called and e-mailed Phillips that day to confront him about the false QSV report that he had submitted. *Id.* at Ex. 13. Phillips admitted he had certified the report without actually going to the stores in person, acknowledged he had falsified the report, and accepted any punishment for it. *Id.* ("I understand that I did wrong and I accept termination or disciplinary action as you feel necessary."); *see also* Phillips Dep. at 165:25-167:2; 171:16-172:6.

21.     Thereafter, DeAngelis terminated Phillips for cause. *Id.* Phillips testified that he has no evidence he was terminated because of his age. Phillips Dep. at 160:18-161:3, 165:9-12.

**F.     Lorenzo is Terminated for Falsifying Documents.**

22.     DMs are responsible for reviewing Exception Based Reports ("EBRs") for stores in their district to help combat issues with cash losses and shrink in their stores. McMorris Dep.[13] 30:21-31:14. In reviewing EBRs, DMs generally must review CCTV to determine the reason for the EBR to ensure that theft is not occurring in the store. McMorris Dep. at 63:20-64:13.

23.     As part of a routine check on high shrink stores, Joe McMorris (an employee in Dollar General's Loss Prevention department) was brought in by his superior (not DeAngelis) to review high shrink stores in Region 73. McMorris Dep. at 15:10-17, 29:21-30:11, Ex. 1. The Loss Prevention Department is outside of Dollar General's Field Operations Department and is in charge of, among other things, identifying and investigating problems surrounding loss in stores. *See id.* at 16:6-23. Lorenzo had recently been trained on how to properly complete EBRs. *See* DeAngelis Dep. at 313:11-315:19 (Lorenzo was trained on EBRs in August 2016 and "had information on both how to do [EBRs] and then what not to do"). During his review, McMorris quickly identified potential issues with some EBRs that Lorenzo had documented. McMorris Dep. at 57:13-63:19, Ex. 1; Lorenzo Dep. at Exhibit 10. McMorris determined that Lorenzo was not reviewing CCTV footage prior to closing out EBRs, despite claiming that she had reviewed CCTV. McMorris Dep. at 70:21-71:2; Lorenzo Dep. at Ex. 10, Ex. 14.

24.     After investigating, Dollar General confirmed that Lorenzo had falsified EBRs, and terminated her for cause. Lorenzo Dep. at Ex. 14. McMorris testified that there was no doubt that Lorenzo had falsified EBRs by claiming she reviewed CCTV footage when she did not. McMorris Dep. at 122:21-24. McMorris also testified that no one ever asked him to investigate Lorenzo or

---

[13] Relevant excerpts of the Deposition of Joe McMorris ("McMorris Dep.") are attached hereto as Exhibit L.

to look for problems with her performance, and further testified that the only reason he brought Lorenzo's actions to Dollar General's attention was his belief that she was not properly performing her duties and was falsifying company records to hide it. McMorris Dep. at 122:25-123:3.

**G.      DeAngelis' Actions Show His Support of Older DMs.**

25.      DeAngelis hired, promoted, and attempted to retain older employees. *See* Johnson Dep. at 209:21-211:10 (DeAngelis providing support for hiring 50 year old), Ex. 17; DeAngelis Dep. at 303:1-10 (DeAngelis hiring employees aged 42, 47, and 54), 335:10-16 (DeAngelis replacing Lorenzo with 54 year old employee), 336:3-7 (DeAngelis providing additional pay and responsibilities to 44 year old), 336:18-20 (DeAngelis hiring 54 year old), 336:21-23 (DeAngelis hiring 48 year old), 337:2-5 (DeAngelis hiring 43 year old).

26.      When Pam Casey (58) asked to transfer out of Oklahoma for family reasons, he supported her, but also tried to get her to stay. Casey Dep. 69:11-14, 72:18-74:15. After the death of her family member, DeAngelis invited her to come back and work with him. *Id.* at 74:6-14.

27.      Additionally, DeAngelis gave Sims a positive annual review (Sims Dep. at 39:1-4), and Sims received a raise and meaningful bonuses under DeAngelis.[14] DeAngelis similarly gave Pam Casey an above-standard performance review. Casey Dep. 97:2-98:14.

**H.      Sims Resigns Alleging DeAngelis Discriminated Against Him; DeAngelis Terminated.**

28.      On December 15, 2017, Sims sent a resignation letter in which he complained of DeAngelis' "terrible language issues," "age discrimination remarks," and "comments about his millennial attitude, his millennial team, and the lack of ability of the 'grumpy old men group'[15] to stay up with him." Sims Dep. at Ex. 31.

29.      Prior to resigning, Sims had never reported any such harassment to Dollar General's ERC, Human Resources, or his direct supervisors.[16] Sims Dep. at 185:12-23, 244:11-245:11.

---

[14] Excerpts from Sims' bi-monthly payroll records are attached hereto as Exhibit M, illustrating that his salary increased in 2017 from $2,768.07 bi-weekly in January 2017 (p. 79) to $2,851.11 bi-weekly (p.83) (an annual raise from **$66,433.68** ($2,768.07 X 24) to **$68,426.64** ($2851.11 X 24)). Moreover, in 2017, under DeAngelis, Sims also received incentive bonuses, including on September 15, 2017, a payment of **$1,278.56** (p.86); and on December 15, 2017, a payment of **$6,000.00** (p. 88), totaling **$7,278.56** in incentive bonuses for calendar year 2017.

[15] Notably, Pam Casey testified that Sims referred to himself, Turvey, and Boyles as the "grumpy old men's club" *before* DeAngelis was ever hired at Dollar General. Casey Dep. at 65:12-66:8.

[16] Sims sent an email to Mia Savaloja on August 31, 2017 entitled "Unprofessional RD conduct." Relevant excerpts of the Deposition of Mia Savaloja ("Savaloja Dep.") are attached hereto as Exhibit N. *See* Savaloja Dep. at Ex. 2. However, there is no question that Sims: was required to report any harassment he became aware of; was properly trained on how to do so; was given multiple avenues to report; but wholly disregarded his obligations to report alleged harassment. Sims Dep. at 63:24-67:15. Sims partnered with HR on multiple occasions and knew he could report allegations to his HR partners. *Id.* at 143:7-146:9. But, rather than invoking the process that he was trained on and had

30.     Dollar General investigated Sims' allegations by conducting interviews with other DMs who had worked under DeAngelis. Bashir Dep.[17] at 76:8-13. At the conclusion of its investigation, Dollar General terminated DeAngelis for inappropriate conduct. *Id.* at 73:7-23.

**I.     Sims Files EEOC Charge With the EEOC; EEOC Files Present Lawsuit**

31.     On September 8, 2018, Sims filed his charge of discrimination with the EEOC. Sims Dep. Ex. 32. Neither Gloria Lorenzo nor Greg Phillips filed charges of discrimination. Lorenzo Dep. at 7:15-17; Phillips Dep. at 8:4-6. Nonetheless, the EEOC filed suit on September 30, 2021 on behalf of Sims, Lorenzo and Phillips, over five years after the relevant facts had transpired. *See* <u>Dkt.</u> 1 ("Complaint").

## III.     ARGUMENT AND AUTHORITIES

Summary judgment is proper in a case in which there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322–23. Dollar General presents sufficient summary judgment evidence to negate essential elements for each of the EEOC's claims. In addition, the EEOC has no evidence to support its claims for harassment, constructive discharge, age discrimination, or retaliation.

**A.     Dollar General is Entitled to Summary Judgment on EEOC's Harassment Claims.**

The EEOC alleges that DeAngelis "harassed district managers based on age," through "age-biased comments, name calling, and threats." Complaint ¶ 18. Further, the EEOC alleges that DeAngelis created an age-based hostile work environment "that was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe so as to alter the conditions of employment" for the Claimants. Complaint ¶ 53. The EEOC does not allege that any employees other than DeAngelis ever made age-based comments or harassed any employees.

To state an age-based claim for harassment, the EEOC must show: (i) the employee is 40 years old or older; (ii) the employee was subjected to harassment, either through words or actions,

---

used multiple other times, Sims emailed a random person he did not know (Mia Savaloja) and who had no responsibility for investigating employee complaints. *Id.* at 239:8-11, 239:17-24. Sims never followed up on his email to Savaloja, and Savaloja does not remember receiving it. Sims Dep. at 240:16-23; Savaloja Dep. at 25:23-26:15.

[17] Relevant excerpts of the Deposition of Ahnaf Bashir ("Bashir Dep.") are attached hereto as Exhibit O.

based on age; (iii) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (iv) there exists some basis for liability on the part of the employer. *DeWalt v. Meredith Corp*., 288 F. App'x 484, 495 (10th Cir. 2008); *Howell v. New Mexico Dep't of Aging & Long Term Services*, 398 F. App'x 355, 359 (10th Cir. 2010). The ADEA "is not a civility code, and courts must filter out offhand comments and isolated incidents."

A hostile work environment claim requires that a "rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012); *Hernoe v. Lone Star Indus., Inc*., No. 12-CV-0167-CVE-TLW, 2012 WL 4052536, at *4 (N.D. Okla. Sept. 13, 2012). In determining whether a working environment is hostile, courts look to several factors, including: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Cink v. Grant Cnty., Oklahoma*, No. CIV-13-1069-C, 2016 WL 1717230, at *6 (W.D. Okla. Apr. 28, 2016); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Further, an employee must show that the environment was both objectively and subjectively hostile or abusive. *Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998). Additionally, there is no "general civility code" for the workplace to eliminate hostilities that are not based on protected categories. *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012); *see also Wilbanks v. Nordam Group, Inc.*, No. 09-CV-0572-CVE-TLW, 2010 WL 4272581, at *7 (N.D. Okla. Oct. 25, 2010) (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim where she identified only one age-discriminatory statement)

### 1.   Claims Regarding Lorenzo's Allegations of Harassment Are Not Actionable.

The EEOC's claim for harassment regarding Lorenzo fails because the EEOC cannot show that Lorenzo was subjected to a hostile work environment. Instead, she alleges a handful of benign comments, and the few actually directed at her had nothing to do with age. Lorenzo complains of six comments by DeAngelis, with a few of them repeated on more than one occasion for a total of 7-9 comments between July and October 2016. She alleges DeAngelis 1) called "the guys" grumpy old men "in a joking way"; 2) said that throwing freight (the process of moving merchandise from

the backroom to the store shelves) was a "young man's job"; 3) said the region needed "fresh blood"; 4) asked her once if she could "keep up" with him while walking; 5) told her she was not qualified for her job; and 6) asked her if *he* had to tell *her* Store Managers what to do, then why did he need her? Lorenzo Dep. 95:11-24, 107:22-108:14, 119:6-121:2.

Lorenzo admits that the first comment: was not directed at her, but to "the guys" "in a joking way"; she claims to have heard it 2-3 times; and that it was directed by DeAngelis "at anyone older than he was" (and she said he was 29 years old (*id.* at 91:9-16)), whether it be Store Managers or DMs. *Id.* at 107:22-108:14, 114:6-115:9, 120:13-15. The second comment was not aimed at her or said about her DM job. Instead, she testified that the comment was made when she and DeAngelis were discussing the workload of her Store Managers and the amount of freight they needed to move through their stores. Lorenzo admits, "[t]hat was not what I was hired to do, is go in and throw freight", but instead, her job was "to make sure that [the stocking of shelves was] getting done" and DeAngelis "gave the impression" that she should travel to her stores to "ensure that this is done." *Id.* at 97:14-99:12. There is no evidence that this alleged "young man's job" was related to her DM position at all, and instead, it was specifically and admittedly not. *Id.*

The remaining comments make no reference to age, nor does Lorenzo have evidence that DeAngelis was commenting on her age. Lorenzo admits that the third comment regarding "fresh blood," was made related to a need to hire new people, and that she never heard him say "young blood." *Id.* at 116:10-15, 130:22-24. The fourth comment regarding "keeping up" was made during a store visit while the two of them were walking. Lorenzo noted that she is short, he was getting ahead of her, that it may have just been a comment that she "wasn't walking fast enough to suit him," and certainly he did not make any reference to her age. *Id.* at 115:10-116:6, 119:9-21, 120:16-20, 132:9-17. The fifth and sixth comments, although they may have insulted her, are strictly related to her job performance. Such infrequent, minor comments that were not physically threatening or humiliating could not have unreasonably interfered with Lorenzo's work performance or subjected her to an objectively or subjectively hostile or abusive work environment. As such, summary judgment is appropriate.

### 2. Claims Regarding Phillips' Allegations of Harassment Are Not Actionable.

The EEOC's claim relating to Phillips also fails to identify serious conditions that rise to a discriminatory change in his work environment. He could only recall one specific comment in which DeAngelis stated he "wanted to build a millennial team, that [the DMs] were a bunch of

grumpy old men and that if we couldn't keep up with the pace of the region and his expectations, then we needed to find another job." Phillips Dep. at 93:5–13. DeAngelis made no other comments regarding Phillips' age. *Id*. 93:11–13. This single comment cannot constitute harassment or create a hostile work environment. Indeed, Phillips only made complaints regarding DeAngelis to Human Resources regarding his "mega aggressive and totally different approach to doing business," which had "[n]othing to do with age…" *Id.* at 134:6–14. Such alleged "mega aggressive" business approaches do not equate to harassment. *Morris*, 666 F.3d at 664. Because Phillips complains only of rude, off-handed comments, along with cussing and an intense management style, the EEOC cannot demonstrate an objectively or subjectively hostile or abusive work environment for Phillips.

### 3. Claims Regarding Sims' Allegations of Harassment Are Not Actionable.

The EEOC's claims for harassment related to Sims similarly do not rise to a discriminatory change in his work environment. Sims makes the following allegations of harassment on the basis of age: 1) DeAngelis referred to employees as the "grumpy old men club"; 2) DMs were told that DeAngelis' millennial team would not put up with under-performers, so they would need to quit or be terminated if they could not perform; and 3) DeAngelis said he could terminate anyone as he was told to do what he needed to do to correct the low-performing Region. Sims Dep. at 226:24-227:14, 230:14-24, 236:20-23.

As to the first comment, Casey testified that Sims and his colleagues referred to themselves as the "grumpy old men" *before* DeAngelis was even hired. Casey Dep. 66:2-16.[18] Whether or not DeAngelis introduced this comment, Sims admits that the comment was said in jest that it likely referred to the movie by the same name. Sims Dep. at 156:2-7.[19] This comment is relatively benign and does not show the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez*, 684 F.3d at 957.

The second and third comments were interrelated in that DeAngelis allegedly said that if a DM could not keep up, he had the authority to fire them. Although Sims felt threatened by the

---

[18] Sims (and others) named their paintball team "Grumpy Old Men" at a regional event before DeAngelis' hire. *Id.*

[19] Sims was very inconsistent in relaying when or how these statements were allegedly made, but alleged that this comment was repeated 2-3 times per week in email (to which none have been found), on voicemails (to which Sims admits that he cannot actually recall), in person in front of others, or individually (on the phone or in person). *Id.* at 158:21-160:6, 165:9-21, 236:15-19 (admits he has never seen emails containing any derogatory statements). He recalls complaining about having to attend Saturday morning meetings and admitted that it *could have been* where this comment was started—that those complaining were in the grumpy old men club. *Id.* at 156:25-158:20.

statements, it is undisputed that DeAngelis was hired to turn around a low performing region—one that had admittedly been in the bottom 25% for "a long time." Sims Dep. at 147:25-149:3. Sims admits that these statements were *not* based on age, and that DeAngelis said this to *everyone* in the Region. *Id.* at 306:1-6 (everybody got comments "quit or be fired" if you cannot meet standards), 165:22-166:6, 167:23-168:25. Even though Sims states that DeAngelis said he could terminate anyone, Sims admits neither DeAngelis nor anyone else suggested that DeAngelis could terminate DMs for any reason (like age) other than their job performance. *Id.* at 190:12-191:8.[20] Sims contemporaneously admitted that DeAngelis brought welcome and needed change to the region. *See id.* Ex. 21.[21] Moreover, DeAngelis was addressing the performance issues of *all* the DMs, not just the older ones. Employees of the allegedly favored younger group of DMs[22] were also held accountable by DeAngelis for poor performance. In fact, of the younger DMs, Amy Parker was put on a performance improvement plan (PIP), Curtis Andrews was called out in front of the other DMs, and Melanie Burden was fired. Sims Dep. at 212:18-22, 216:18-217:6, 217:16-218:9. During the same time period, DeAngelis gave Sims a good review (*id.* at 217:10-15, 163:14-165:8, Dep. Ex. 14), Sims received a raise, and Sims received significant bonuses. *See fn* 14*, supra.* Sims' allegations of age-based harassment are simply not supported by the evidence.

**B.      Summary Judgment Is Appropriate on the EEOC's Claim for Sims' Constructive Discharge.**

The EEOC alleges a claim for constructive discharge claiming that Sims was forced to resign on December 15, 2017, based on DeAngelis' "increased harassment."[23] A successful claim for constructive discharge requires that a plaintiff show a deliberate action on the part of an employer that makes or allows the employee's working conditions to become so difficult or intolerable that he has no other choice but to resign. *Cejka v. Vectrus Sys. Corp.*, 823 Fed. App'x

---

[20] "Q. He said that he could terminate old people? A. Oh, old people, no. No, he didn't say that. Q. He could terminate people who were underperforming? A. Yes. Q: No one told Sims that DeAngelis had free rein to terminate people because they were old … did they? A. No."

[21] Sims contemporaneously wrote, "Our region has been shaken up but when I really take a hard and honest look at what has happened, I must say it was needed and has really been an eye opener for me. I really didn't want to admit to just how broken we were! … He has not let me down on any occasion! … Nic has an intense desire to get this region back on track and it has really forced me to take some hard look at what am doing as well as my team and quite frankly, I needed that! … These are my honest opinions and I hope they help you in some way." Sims Dep. at Ex. 21.

[22] Sims alleged that these persons were part of the favored, younger millennium group: Curtis Andrews, Zachary Burns, Amy Parker, Melanie Burden, Tim Petering, Greg Hunter, and Deana Fisher. Sims Dep. at 211:25-212:5.

[23] Although the EEOC also cites to alleged "discriminatory treatment," it does not bring a claim of age discrimination against Dollar General related to Sims. Complaint ¶ 49. Further, it alleges that Sims was forced to resign because of "intolerable age-based harassment and hostile work environment." Complaint ¶ 58.

591, 600 (10th Cir. 2020). The employee also must establish that the employer engaged in "illegal discriminatory acts" that made the conditions of employment objectively intolerable. *Bennett v. Windstream Communications, Inc*., 30 F. Supp. 3d 1243, 1260 (N.D. Okla. 2014), aff'd, 792 F.3d 1261 (10th Cir. 2015); *Sandoval v. City of Boulder*, Colo., 388 F.3d 1312, 1325 (10th Cir. 2004).

The EEOC cannot rely on its bare claim that DeAngelis' behavior constituted a "continuing violation," or continued harassment caused a constructive discharge; it has presented no other evidence to show that DeAngelis' behavior was so sufficiently severe or pervasive to affect Sims' conditions of employment. As a result, it cannot survive summary judgment. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, (2004) ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"). Further, the EEOC must offer evidence to prove that Sims had "no other choice but to quit" to establish its constructive discharge claim. *Sanchez v. Denver Public Schs.*, 164 F.3d 527, 534 (10th Cir. 1998).

Sims alleges he felt compelled to resign on December 15, 2017 (Sims Dep. at Ex. 31 (dated resignation letter)) for four reasons: 1) alleged ongoing age-related harassment by DeAngelis (defined as "grumpy old men club" comments and needing to meet the standards of the millennial team to keep his job); 2) threats of being fired if he did not meet performance standards (but he admits any job threats to him were based on poor performance in his district, and such threats were also made to *all DMs* of *all ages*) (*see also* Sims Dep. 306:1-6)); 3) two other DMs in his "age range" were fired (but admittedly, this was *over a year prior* to his resignation)[24]; and 4) due to getting no response from Mia Savaloja. *See* Sims Dep. 260:11-265:5.

For the same reasons that the first and second reasons outlined above do not create a hostile work environment (*see supra*), the cited comments also do not support a constructive discharge claim. Being called part of a "grumpy old men club" (a term invented by Sims and his co-workers to refer to themselves (*see* Casey Dep. at 65:12-66:8)), particularly with knowledge of DeAngelis's otherwise brash management style, did not create an environment so severe or pervasive that a reasonable person would feel compelled to resign. In fact, Sims chose to work under these alleged conditions for well over a year before he resigned, proving that the conditions were not intolerable. *Sandoval v. City of Boulder, Colo*., 388 F.3d 1312, 1326 (10th Cir. 2004) (noting that plaintiff's

---

[24] Phillips was terminated on October 12, 2016, 14 months before Sims resigned. Phillips Dep. Ex. 13. Lorenzo was terminated on November 16, 2016, 13 months before Sims resigned. Lorenzo Dep. Ex. 17.

complaints of "humiliation" that occurred one year prior to her resignation did not support her allegation of constructive discharge); *Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 761 (10th Cir. 2020) (finding that plaintiff could not prove job was objectively "intolerable" where allegedly offensive actions took place three years before his resignation).

Moreover, during this same time period that he now alleges he was being discriminated against based on his age, Sims was twice asked to give his honest feedback on DeAngelis and his management style and did not voice a single complaint.[25] Further, the threat about meeting new performance criteria or losing their jobs was universally made to all the DMs, *of all ages*, and resulted in at least one of the allegedly favored younger DMs being terminated for not meeting performance expectations. Although Sims now alleges that he "feared" losing his job because of his "age," in reality, he readily admits that all the criticism he received from DeAngelis related to his *job performance* was legitimate and *not* based upon his age (Sims Dep. at 219:25-221:25, 223:6-25, 224:22-25, 226:11-23), that the criticism, which he took to heart, was needed to help fix the broken region, and that he performed better based upon the coaching from DeAngelis (Sims Dep. at 223:6-224:2, 224:22-225:6). His improved performance was rewarded with a positive performance review from DeAngelis (Sims Dep. at Ex. 14), a raise, and receiving over $7,200 in bonuses in 2017, including a $6,000 bonus that he received the day he resigned. *See* fn 14*, supra*. Sims' decision to hang around for his large year-end bonus conclusively demonstrates that the working conditions of his job were tolerable.

Next, as a matter of law, Sims's own actions disprove that the third reason could support a constructive discharge claim. First, Sims admits that he knew nothing about the reasons these DMs were terminated in 2016 (Sims Dep. at 192:17-193:17),[26] and also admits younger DMs were also disciplined and terminated by DeAngelis (Sims Dep. at 212:18-22, 216:18-217:6, 217:16-218:9). His choice to remain employed *another 14 months after* these DMs were terminated demonstrates that Sims had (and executed) a choice other than to quit (which was to stay employed), thus, defeating his constructive discharge claim related to these terminations.

Lastly, as to his fourth reason, Sims had an affirmative duty to report harassment through

---

[25] In September 2016, Sims did not offer any reports of age discrimination or harassment during DeAngelis's New Leader Assimilation. Instead, he said nothing. Sims Dep. at 194:9-21, 195:16-196:14; *see supra*, II.D. at ¶16. Further, when asked to opine on DeAngelis's management style after Boyles resigned, Sims was overly complimentary of DeAngelis. *See supra*, II.C.at ¶ 11.
[26] Both of these DMs were terminated for falsifying business records. *See* II.E.&F, *infra.*

one of the multiple prescribed avenues pursuant to Dollar General's anti-harassment policy. His report to Mia Savaloja was not an adequate attempt to raise his concerns. *See* Part III.C*., infra.* The use of an unsanctioned attempt to report harassment does not give him grounds to "quit" (months later) when it did not yield a response. Sims had affirmative duties to report harassment through appropriate channels. For these same reasons, Dollar General is entitled to summary judgment under its *Ellerth/Faragher* defense as outlined in detail below. *See* III.C., *infra.* Moreover, Sims had the choice to stay employed *without* DeAngelis, as Dollar General fired DeAngelis and asked Sims to stay rather than resign. Sherrod Dep. at 75:19-25. Sims declined this alternative choice.

**C.    Dollar General Is Entitled to Summary Judgement Under *Faragher/Ellerth* Due to Sims' Failure to Report the Alleged Harassing Conduct**

The *Ellerth/Faragher* affirmative defense is available where the "employer exercised reasonable care to prevent and correct promptly" harassing behavior, and "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer…" *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998) (citing *Faragher v. Boca Raton*, 524 U.S. 775 (1998)). In order to satisfy the first element, an employer must show that it acted reasonably to both prevent and correct harassment. *Stapp v. Curry Cty. Bd. of Cty. Commissioners*, 672 F. App'x 841, 849 (10th Cir. 2016). An employer acts to prevent harassment "if it adopted valid anti-harassment policies and distributed those policies to employees via employee handbooks." *Id*. As to the correction requirement, an employer must act reasonably promptly "when given proper notice of [the employee's allegations] under its complaint procedures. *Helm v. Kansas*, 656 F.3d 1277, 1290 (10th Cir. 2011). Second, an employer satisfied its burden when it shows that "the victimized employee unreasonably delayed in reporting or never reported incidents of prohibited harassment." *Stapp*, 672 F. App'x at 849–50 (citations omitted).

As a DM, Sims was in a position of tremendous responsibility, having the responsibility to oversee the management and operations of 15-20 Dollar General stores in his district. Sims was first hired as a Store Manager, was trained to run a Dollar General store, and was responsible for the implementation of Dollar General's policies in his store. Sims Dep. at 53:24-54:8, 55:11-21, 58:5-7, 58:24-59:2. In 2008, he was promoted to DM and remained in this position until his voluntary resignation on December 15, 2017. *Id.* at 61:18-62:7. In both positions, Sims admitted that he was required to abide by, implement, and enforce Dollar General's Anti-Discrimination and Harassment policy in his stores and district, that he was the "eyes and ears" of the company,

17

and that if he was aware of *any* discriminatory or harassing behavior that it was his *affirmative responsibility* to report it to the appropriate company personnel. *Id.* at 64:2-66:8.

Part of Sims' job was to work with the Human Resources partner assigned to his district to resolve employee complaints. Sims Dep. at 142:7-23 (Sims partnered with HR to resolve employee complaint), Ex. 19. He admits to not only understanding the policy, but implementing and enforcing all of Dollar General's policies in his store and district, and training all his employees on the same. *Id.* at 66:5-67:15, 69:5-70:5, 71:12-18, 73:3-15, 74:3-76:5.[27] Sims acknowledged that, as a manager for Dollar General, he had an even greater responsibility for enforcing these policies. *Id.* at 73:16-19. In fact, Dollar General enacted a Code of Conduct that instructed managers that it was incumbent upon them to ensure that the workplace remained free from discrimination and harassment, and Sims affirmatively agreed in writing that he understood he was required to *and would* report any instances of discrimination or harassment to the company. *Id.* at 76:8-80:4, Ex. 9. In addition to his new hire paperwork (Sims Dep. at Ex. 5), Handbooks (Sims Dep at Ex. 6, Ex. 7), and the Code of Conduct (Sims Dep. at Ex. 9), all acknowledged by Sims, Dollar General also put its policy in its Standard Operating Procedures (SOP), outlining these same avenues to report harassment – to a supervisor, a next-level supervisor, Human Resources or the ERC, which Sims further acknowledged and understood. *Id.* at 80:7-81:14.

There is no question that Sims was required to report harassment he knew of, was properly trained on how to do so, was given designated avenues to report, and wholly disregarded his responsibilities as a manager. Rather than invoking the defined process that he had used multiple other times,[28] Sims (who alleges to have been a victim of harassment since July 2016[29]) said nothing until August 31, 2017 when he sent an email entitled "Unprofessional RD conduct" to a

---

[27] Specifically, he told his employees of the paths that they should follow to report discrimination or harassment, including going to their immediate supervisor, the person above the immediate supervisor, or to Human Resources or the Employee Response Center (ERC), who could be reached at tollfree numbers. *Id.* at 66:9-67:15; 74:3-76:5.

[28] Sims partnered with Human Resources and Employee Relations on numerous occasions and knew he could reach out to them with issues. Sims Dep. at Ex. 15 (email from Employee Relations Manager to Sims informing him of her responsibilities, which included reporting allegations of discrimination and harassment), Ex. 16 (Sims partnering with Employee Relations), Ex. 17 (same), Ex. 18 (same), Ex. 19 (same). In fact, when his Employee Relations partner interviewed him after his resignation, she asked Sims why he did not report the allegations sooner since they had developed a "business rapport." Sherrod Dep. at 119:22-120:20.

[29] Just by way of example, Sims claimed that at the time that Boyles resigned, which was on September 3, 2016, Sims was being subjected to age related harassment. *See* Sims Dep. at 37:20-25.

person he did not know[30] and who has *no responsibility* for investigating employee complaints.[31] He readily admits that he did not voice his complaints through any number of appropriate, well-known, viable, and prescribed avenues to address alleged harassment. *See* Sims Dep. 238:5-14. Moreover, when he did properly voice a complaint at the time of his voluntary resignation, it was promptly investigated, DeAngelis was terminated, and Sims was asked to continue his employment with Dollar General, which he declined to do. Sherrod Dep. at 75:19-25.

In a case strikingly similar to this one, the employer was granted summary judgment, which was upheld by the Tenth Circuit Court of Appeals. In *Calloway v. Aerojet General Corp.*, 419 Fed. App'x 840 (10th Cir 2011), the Plaintiff claimed sexual harassment by her supervisor. During her employment, she confided in a "manager" who she did not believe had any responsibility to report the harassment, and who did not elevate her concerns. *Id.* at 841-42. The Plaintiff never complained through the provided channels set forth in the company's well defined anti-harassment policy until she had left her position on disability leave. *Id.* at 842. In addition, when another employee complained that the Plaintiff was receiving preferential treatment from the alleged bad-actor, the Plaintiff denied any improper conduct by the bad-actor and failed to report the alleged sexually harassment. *Id.* at 841. During this time period, she received pay increases and a promotion. The Tenth Circuit held that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer who had exercised reasonable care to prevent and correct harassment. *Id.* at. 844.

Sims also allegedly believed his supervisor was harassing him; confided in another "manager" who did not have the authority or responsibility to investigate his claims; failed to report the alleged harassment through the well-defined channels before quitting; and when there was an investigation of DeAngelis based upon a complaint of age bias from another employee, he did not disclose his own concerns, but instead gave a glowing review to Human Resources regarding DeAngelis. The result here must be the same as *Calloway*. The EEOC's claims based on alleged harassment against Sims claims are barred and must be dismissed.

**D.     Summary Judgment is Appropriate on EEOC's Discharge-Based-on-Age Claims.**

Under Supreme Court precedent in *McDonnell Douglas v. Green*, the EEOC must show:

---

[30] Sims testified that he did not know Mia Savaloja, had never talked to her to his knowledge, and just knew that "she was in corporate." Sims Dep. 239:8-11, 239:17-24.
[31] Mooney Dep. at 106:20-24 (stating that Savaloja was in charge of "Communications"); Reardon Dep. at 74:17-75:2 (stating that Savaloja was in charge of "Business Communications").

(i) the employees were members of the protected class: at least 40 years old; (ii) the employees were qualified for their positions; (iii) the employees were terminated; and (iv) the employees were replaced by someone sufficiently younger to permit an inference of age discrimination. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff makes a *prima facie* case of discrimination, the defendant has the burden to offer a nondiscriminatory reason for the adverse employment action. *Id*. If the defendant meets this burden, the plaintiff must then show that the legitimate reasons offered for the termination were a pretext for age discrimination. *Id*. at 807.

### 1.   EEOC's Discharge Based on Age Claims Fail Related to Lorenzo and Phillips.

The EEOC's claim that Lorenzo and Phillips were terminated based on their age fails because it cannot establish pretext related to Dollar General's nondiscriminatory reason for terminating them. In order to determine whether a plaintiff has presented sufficient evidence "to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason," the court must look to, among other circumstantial evidence, "the probative value of the proof that the employer's explanation is false." *Jones v. Oklahoma City Pub. Sch*., 617 F.3d 1273, 1280 (10th Cir. 2010). An employer is therefore entitled to summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision…" *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000).

Dollar General's proffered evidence conclusively establishes that Lorenzo and Phillips were terminated solely for falsifying documents related to two separate investigations. *See* McMorris Dep. at 122:21-24, 122:25-123:5; *see also* Phillips Dep. at Ex.13. Phillips readily admitted that he falsified documents on multiple occasions.[32] Per Dollar General's Coaching and Progressive Counseling policy, which Lorenzo and Phillips fully understood, Dollar General may immediately terminate an employee if it discovers that the employee falsified company documents, even if it is the employee's first disciplinary offense. Lorenzo Dep. at 41:4-17, 43:9-44:3, Ex. 4 at SIMS_0000737; Phillips Dep. at 38:6-19, Ex. 5 at SIMS_0000737. Not only was Lorenzo aware of this policy, but proving that she understood it was to be enforced, Lorenzo terminated two of her *own* employees for violating this very policy. Lorenzo Dep. at 71:17-73:14, 105:7-18. For all

---

[32] *See* Phillips Dep. at 169:11–13 ("Q. Do you admit to falsifying documents in this e-mail? A. Yes, I do."); (*Id*., 171:16–18) ("Q. So bottom line is I did falsify the survey. That's true? A. Yes."); (*Id*., 171:19–172:6) ("Q. You know it was a mistake? A. Well, of course, yes. Q. And you did falsify the survey?... A. Yes."). Further, Phillips admits having no evidence that he was discharged due to his age. *Id*. at 160:18-161:3, 165:9-12.

of these reasons, Dollar General is entitled to summary judgment on the EEOC's discharge claims.

### 2.      EEOC's Claim Related to Phillips Also Fails due to After-Acquired Evidence.

The EEOC's claims regarding Phillips' discharge also fail because Dollar General uncovered after-acquired evidence that would have prevented Phillips from *ever* receiving a job at Dollar General. Neither the Court nor Dollar General can turn a blind eye to facts that are learned in the course of discovery. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.").

Phillips indicated on his application for employment with Dollar General that he had not been previously fired or convicted of a crime. Phillips Dep. at Ex. 16. During the course of discovery, however, Dollar General learned that Phillips was in fact terminated from a prior position at Lowe's for theft of company property and was later *convicted* of that offense. Phillips Dep. at 47:23-48:24, 52:9-25, 189:20-191:25, Ex. 16. Had Dollar General known that Phillips lied on his application for employment, Dollar General would never have offered him employment.[33] The Court cannot now permit Phillips to recover damages for a position he would never had been offered had Dollar General known he lied on his application.[34]

### E.      EEOC's Claims for Retaliation Against Lorenzo and Phillips Also Fail.

*McDonnell Douglas* also applies to the EEOC's retaliation claims. The EEOC must show: (i) the employee engaged in a protected activity; (ii) the employee was subjected to an adverse employment action; and (iii) a causal connection exists between the protected conduct and the adverse action. *Stapp*, 672 F. App'x at 850. If the plaintiff makes a *prima facie* case of retaliation, the defendant has the burden to articulate a legitimate, non-retaliatory reason for the adverse action. If Dollar General does so, to survive summary judgment, the EEOC must show that Dollar General's termination was pretext for retaliation. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108,

---

[33] *See* Declaration of Karla Unbehagen at ¶¶3-5, attached hereto as Exhibit P.
[34] Even if the Court chooses not to dismiss Phillips' claims based on the after-acquired evidence, it should limit his damages to the date that Dollar General uncovered his lies on his job application and deny all pay from that date forward. *Ballard v. Muskogee Reg'l Med. Ctr.*, 238 F.3d 1250, 1254 (10th Cir. 2001) (denying front pay remedy where the employer learns that the employee "would have been legitimately laid off sometime before trial").

1118 (10th Cir. 2007). The only relevant inquiry is "whether the employer honestly believed its reasons and acted in good faith upon them." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007). Pretext is only established by showing that the reason for the termination is "unworthy of belief." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008).

### 1.     The EEOC's Claim for Retaliation Related to Lorenzo Fails.

The EEOC alleges that Dollar General terminated Lorenzo in retaliation for comments made during Dollar General's investigation into complaints made against DeAngelis. However, the EEOC cannot show any causal connection between Lorenzo's September 9, 2016 interview regarding DeAngelis' and her ultimate termination on November 16, 2016. Although she was on a PIP,[35] her termination resulted from an independent loss prevention investigation in her district resulting in a discovery that she was falsifying documents. In essence, Lorenzo was terminated because she was documenting that she had conducted proper investigations of cash register irregularities by watching CCTV footage when, in fact, she had not, leading to potential ongoing losses in her district. *See* McMorris Dep. at 70:21-71:2, 122:21-24, 122:25-123:3; Lorenzo Dep. at Ex. 10, Ex. 14. This investigation was prompted by loss prevention, not DeAngelis. McMorris Dep. at 15:10-17, 29:21-30:11, Ex. 1. McMorris did not typically work in Lorenzo's district and had no knowledge of Lorenzo's prior statement to Sarah Price regarding DeAngelis (*id.* at 15:10-16:12), and thus could not have factored that into the results of his investigation into Lorenzo's falsification of company records. Moreover, to the extent the EEOC argues that DeAngelis ultimately terminated Lorenzo and did so based on retaliation, the evidence establishes that DeAngelis never saw Lorenzo's statement and thus had no reason to retaliate against her. DeAngelis Dep. at 565:11-16.

Without other evidence of retaliation, a protected activity must be very close in time to the challenged adverse employment action to permit an inference of causation. Lorenzo's termination occurred over two months after her interview with HR. *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (finding that, without other evidence, "two months and one week" between the protected conduct and the adverse action is "probably too long for [a plaintiff] to establish causation by temporal proximity alone."); *Conroy v. Vilsack*, 707 F.3d 1163, 1181–82 (10th Cir.

---

[35] Although the EEOC does not allege that Lorenzo's PIP was retaliatory, she nonetheless admitted that she has no evidence that would suggest her PIP was a result of anything other than her own performance deficiencies, and simply feels that it did because it came months after her conversation with HR. *See* Lorenzo Depo 162:163:1; 163:16-22.

2013) ("It appears clear that, if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference). The EEOC cannot show that Dollar General's non-pretextual reason for Lorenzo's termination is "unworthy of belief."

> ## 2.     The EEOC's Claim for Retaliation Related to Phillips' Claim Fails.

Similar to Lorenzo's claims, the EEOC alleges that Dollar General terminated Lorenzo in retaliation for comments made during Dollar General's investigation into complaints made against DeAngelis by Boyles. Again, the EEOC cannot show any causal connection between Phillips' September 8, 2016 interview regarding DeAngelis' and his ultimate termination on October 12, 2016. Phillips Dep. at 148:7-12, 193:6-8. His termination resulted from an independent random store visit by DeAngelis on October 7, 2016, wherein DeAngelis discovered that holiday displays had not been set up and inventory had not been verified, despite Phillips' submission of documents verifying that he had conducted in-person verifications that inventory and displays were in fact prepared for the holiday season. Phillips Dep. at 166:5-167:2; DeAngelis Dep. at 320:4-322:25; Ex. 22; Ex. 23. Phillips was terminated because he documented that he had conducted proper store inspections when, in fact, he had not. Phillips Dep. Ex. 13. Phillips admitted that he certified the report without visiting the store, acknowledged its falsity, and accepted repercussions. *Id* at 165:25-167:2, 171:16-172:6. This investigation was part of DeAngelis' regular duties to perform random store visits and not targeted towards Phillips individually. DeAngelis Dep. 322:20-323:19. Phillips' further acknowledged that, pursuant to Dollar General's handbook, he could indeed be rightfully terminated for falsifying such documents. Phillips Dep. at 238:10-25; Phillips Dep. Ex. 6. Moreover, the evidence establishes that DeAngelis never saw Phillips' statement and thus had no basis for retaliating against him. DeAngelis Dep. at 565:11-16; *see also* Phillips Dep. at 164:10-165:5. Thus, his prior participation in Dollar General's investigation into complaints made against DeAngelis could not have factored into the results of its investigation into Phillips' falsification of company records.

Even assuming that the EEOC can make a *prima facie* case of retaliation against Phillips (which it cannot), the EEOC has not shown that Dollar General's proffered reason for firing Phillips was pretextual. The EEOC cannot show that Dollar General's termination based on Phillips' falsification of documents was pretext for retaliation. Dollar General's proffered reason for Phillips' termination is nonretaliatory and strictly follows Dollar General's handbook, as

admitted by Phillips himself. Phillips Dep. at 238:10-25, Ex. 6. The EEOC cannot show that Dollar General's termination is "unworthy of belief."

> ### 3.   Phillips and Lorenzo's Punitive and Emotional Distress Damages Claims are Prohibited as a Matter of Law.

The Tenth Circuit prohibits recovery of either compensatory or punitive damages for an ADEA discrimination claim. *Villescas v. Abraham*, 311 F.3d 1253, 1259, 1261 (10th Cir. 2002). "[T]here is no reason to treat retaliation claims differently." *Brunner v. GN Bank, N.A.*, 2023 WL 2474683 (D. Kan. March 13, 2023). Accordingly, Plaintiff cannot recover punitive or emotional distress damages under an ADEA retaliation theory either.

Although the 10th Circuit has not explicitly opined on the availability of punitive or emotional distress damages in ADEA retaliation claims, other jurisdictions in the 10th Circuit have rejected the availability of punitive and emotional distress damages and exhaustively demonstrated the incompatibility of such damages within the ADEA's statutory framework. As the District of Kansas recently explained:

> Although the Tenth Circuit has not decided whether those damages are available for retaliation claims under the ADEA or ADA, well-reasoned authorities conclude that they are not. In *Marshall v. BNSF Railway Co.*, No. 18-cv-2385, 2020 WL 128054 (D. Kan. Jan. 10, 2020), Judge Lungstrum considered whether a plaintiff could recover compensatory emotional damages and punitive damages for an ADEA retaliation claim. That decision identified a circuit split, with the Seventh Circuit holding that those damages are available for ADEA retaliation claims, *id.* at *3 (citing *Moskowitz v. Trs. of Purdue Univ.*, 5 F.3d 279, 283–84 (7th Cir. 1993)), and the Fifth Circuit holding that they are not, *id.* (citing *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 592 (5th Cir. 2017)). After reviewing the textual basis for the rulings, Judge Lungstrum predicted that the Tenth Circuit, if faced with the question, would decline to permit such damages in an ADEA retaliation claim. *Marshall*, 2020 WL 128054 at *4 (relying on several district court decisions outside the Seventh Circuit, including a prior District of Kansas decision). [Plaintiff] has not established that the Tenth Circuit would reach a contrary conclusion.

*Brunner,* 2023 WL 2474683, at *18 (D. Kan. March 13, 2023) (collecting cases).

In sum, the 10th Circuit does not permit the EEOC to circumvent the prohibition on punitive damages for ADEA claims by recasting them as retaliation claims. *Id*. The overwhelming precedent from district courts in the 10th Circuit prohibits the creation such a loophole. *See Id.* Accordingly, the Court should enter judgment foreclosing Claimants' requests for punitive damages as a matter of law.

## IV.    CONCLUSION

For these reasons, Dollar General asks the Court to grant this motion and enter summary judgment in its favor on EEOC's harassment, constructive discharge, age discrimination, and retaliation claims.

Dated: November 15, 2023

Respectfully submitted,

*/s/ Joel S. Allen*
Joel S. Allen
OK Bar Number 14668
jallen@mcguirewoods.com
Paul M. Chappell *(Admitted Pro Hac Vice)*
Texas Bar No. 24097489
pchappell@mcguirewoods.com
Melissa M. Hensley
*(Admitted Pro Hac Vice)*
Texas Bar No. 00792578
mhensley@mcguirewoods.com
Cory R. Ford *(Admitted Pro Hac Vice)*
Texas Bar No. 24121098
cford@mcguirewoods.com
McGuireWoods LLP
2601 Olive Street, Suite 2100
Dallas, Texas 75201
Telephone: 214.932.6400
Facsimile: 214.932.6499
Attorney for Defendant
Dolgencorp, LLC

## CERTIFICATE OF SERVICE

On November 15, 2023, a true and correct copy of the foregoing was filed using the Court's CM/ECF system, which will deliver notice of such filing to the following attorneys of record:

Lauren W. Johnston
Senior Trial Attorney
Equal Employment Opportunity Commission
Oklahoma City Area Office
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, Oklahoma 73102
lauren.johnston@eeoc.gov

Dayna F. Deck
Senior Trial Attorney
Equal Employment Opportunity Commission
Kansas City Area Office
400 State Ave., Ste. 905
Kansas City, KS 66101
dayna.deck@eeoc.gov

Joshua C. Stockton
Equal Employment Opportunity Commission
Oklahoma City Area Office
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, Oklahoma 73102
Joshua.stockton@eeoc.gov

Megan Lowe Stiles
EEOC Kansas City Area Office
400 State Ave., Ste. 905
Kansas City, KS 66101
megan.lowe.stiles@eeoc.gov

*/s/ Joel S. Allen*

26